| **JOHN FLEET** | : **CIVIL ACTION** |
| | : |
| v. | : **NO. 17-3562** |
| | : |
| **CSX INTERMODAL, INC.,** *et al.* | : |

**KEARNEY, J.**                                                                               **July 18, 2018**

## MEMORANDUM

An African American employee with diabetes, after hearing insults over the work radio which he perceived to be directed to him, chose to drive to his Caucasian co-worker's location to confront and exchange words with the co-worker. A supervisor investigating this confrontation concluded the employee caused the problem and told him to go home for the remainder of his shift. The employee refused to leave work and admits cursing at his supervisor as overheard by another supervisor. The employer charged him with insubordination, held a hearing with union representation, and the hearing officer concluded the former employee is responsible for insubordination. The employer then terminated his employment. The former employee then sued his former employer and supervisors for race and disability based discrimination and retaliation. Ignoring his conduct, he complains this termination is race-based discrimination or retaliation – although he sprinkles disability in here and there. There is no evidence his employer treated African American workers charged with insubordination differently than Caucasian workers. The opposite is shown and the employee does not answer the undisputed evidence. The employee has not adduced evidence to support his theories. Absent genuine issues of material fact on the claims before us, we grant summary judgment for the former employer and supervisors.

## I. Undisputed Facts[1]

John Fleet, an African American and diabetic, worked for CSX Intermodal Terminals, Inc. ("Terminals") as an intermodal service worker from November 2015 until Terminals fired him on March 3, 2017 after a disciplinary hearing.[2] Terminals provides intermodal shipping services to its customers, shipping freight by truck and train from its intermodal terminals including in Philadelphia.[3] The Transportation Communication Union represented Mr. Fleet under a collective bargaining agreement with Terminals governing Mr. Fleet's employment.[4]

Mr. Fleet reported directly to Terminals' Operations Supervisor Ryan Gomez. Mr. Gomez's responsibilities included supervising intermodal service workers like Mr. Fleet to ensure work is completed productively and safely.[5] Mr. Gomez, in turn, reported directly to Jonathan Lowe, Manager of the Philadelphia workplace.[6] Mr. Lowe's responsibilities included managing the workplace and, indirectly, supervising Terminals' employees.[7] Mr. Lowe interviewed and hired Mr. Fleet.[8]

### *Mr. Fleet receives counseling from March to August 2016, including for eating during a safety meeting.*

Several months after his hiring, Terminals counseled Mr. Fleet and a co-worker regarding a verbal altercation between the two of them.[9] Terminals wrote a letter reminding Mr. Fleet the company's policies prohibit "mak[ing] another employee feel uncomfortable or threatened by [his] words or actions in the workplace."[10] Mr. Fleet received counseling for violating safety rules on May 9, May 11, June 10, July 29, and August 17, 2016.[11]

On May 9, 2016, Terminals posted a notice prohibiting "eating/snacking during or after job safety briefing[s]."[12] Terminals' management holds mandatory job safety meetings with intermodal service workers at the beginning of each shift to discuss safety issues and responsibilities in the work day.[13] The meetings typically last five to ten minutes and it is

2

undisputed it is important for employees to pay attention during the safety meetings.[14] At the beginning of the May 10, 2016 safety meeting - the day after Terminals posted the no eating notice - Mr. Fleet began eating a sandwich at the start of the meeting.[15] Mr. Gomez told Mr. Fleet he should not eat during the safety meeting.[16] Mr. Lowe issued Mr. Fleet a counseling letter on May 16, 2016 for eating a sandwich at the meeting and also for the May 9 and 10 violations of safety rules.[17]

Several days later, Mr. Gomez saw another intermodal service worker, Jim Thompson, finishing a sandwich as a job safety meeting began.[18] Mr. Gomez told Mr. Thompson, who is Caucasian, he must finish eating before the start of safety meetings.[19] It is undisputed Mr. Thompson did not receive written counseling.[20] Defendants contend Mr. Thompson did not receive written counseling because he was finishing the sandwich as the safety meeting began, as opposed to starting to eat as the meeting began, and because he had no other counseling.[21] Mr. Fleet attributes the difference in treatment between Mr. Fleet and Mr. Thompson to Mr. Gomez's "pattern of treating" Caucasian employees more favorably than African American employees.[22]

### *Terminals' disciplinary policies and procedures.*

Terminals' written disciplinary policy classifies offenses into three categories: minor, serious, and major (the "Policy").[23] A minor offense is defined as "a policy or rule violation that does not result in damage to equipment or property, and that are not otherwise identified as 'serious' or 'major' in [other parts] of this policy."[24] A serious offense is defined as "including all policy or rule violations that result in damage to equipment or property."[25] A major offense is defined as "a rule violation or offense so serious or egregious as to warrant removal from service prior to hearing and which may result in dismissal."[26]

3

Minor and serious offenses are handled progressively, with the first minor offense resulting in counseling, and subsequent minor offenses possibly resulting in suspension or discharge.[27] Employees committing serious offenses receive discipline points which, upon accumulation, may result in discharge.[28] Points are measured in a three year rolling period.[29]

Under Terminals' Policy, counseling is not considered discipline and, consequently, employees receiving counseling do not face actual discipline, do not receive a charge letter, and are not entitled to an investigation hearing.[30] For "repetitive cases" of minor offenses, Terminals "may elect to conduct a formal hearing under the collective bargaining agreement" and, based on the findings of any hearing, may administer appropriate discipline.[31]

Terminals' Policy and the applicable collective bargaining agreement prohibit Terminals from disciplining employees without an investigation hearing unless the employee waives a hearing.[32] When a manager believes an employee committed a rule violation, Terminals notifies the employee in writing of the charge and schedules a hearing.[33] The hearing is conducted by a hearing officer from Terminals' management (with no involvement in the decision to charge the employee) and the employee with union representation who may cross-examine any Terminals witness and present evidence.[34] After the hearing, the hearing officer in consultation with the company's Labor Relations Manager decides whether to, and the extent of, employee discipline.[35]

### *Mr. Fleet's request for FMLA leave.*

Mr. Fleet applied for intermittent leave under the Family Medical Leave Act (FMLA) on August 1, 2016 because of his diabetes.[36] Terminals approved Mr. Fleet's request for intermittent FMLA leave beginning August 1, 2016 despite Mr. Fleet's ineligibility for FMLA leave at that time.[37] There is no dispute Mr. Fleet began working at Terminals on November 19,

4

2015 and, under the FMLA, did not become eligible for FMLA leave until employed for at least twelve months.[38] Terminals attributes its mistake to clerical error.[39] Terminals realized its error, informed Mr. Fleet, advised him to re-apply for FMLA leave after November 19, 2016, and did not penalize him for any absences taken in reliance on the approval of FMLA leave.[40]

On October 19, 2016, Mr. Fleet reported to Mr. Lowe numbness in his hands, blurry vision, and the need to see a doctor.[41] Mr. Lowe completed a "Withheld from Service Form" the same day attributing the reason for removal to Mr. Fleet's high blood sugar, and prepared a letter to Mr. Fleet's doctor asking for an evaluation of Mr. Fleet's ability to safely return to work.[42] At his deposition, Mr. Fleet swore Mr. Lowe put him out of service on October 19 because of safety issues, and not as discipline.[43] Mr. Fleet's doctor reported Mr. Fleet could return to work without restrictions on October 26, 2016 and, after review by CSX's Chief Medical Officer, Mr. Fleet returned to work on October 26, 2016.[44] Terminals' FMLA File Record does not count Mr. Fleet's October absence as FMLA leave.[45]

Mr. Fleet again applied for FMLA leave on November 19, 2016, Terminals approved his request, and he began using intermittent FMLA leave in November 2016.[46]

### Mr. Fleet complains about Mr. Gomez to the Terminals' ethics hotline.

On November 6, 2016, Mr. Fleet called Terminals' ethics hotline to complain about the counseling he received for eating a sandwich at the May 9 job safety meeting and other "write ups," and to report Mr. Gomez following him to the bathroom and around work.[47] At his deposition, Mr. Fleet testified he called the ethics hotline "about the diabetes thing" and expressed his "complaints and [his] concerns about the diabetes and whatever else was going on at the time of me feeling like I was being a target."[48]

5

Terminals' Employee Relations Manager Matthew Charron investigated Mr. Fleet's complaint to the ethics hotline.[49] In the course of his investigation, Mr. Charron interviewed Mr. Fleet, Mr. Gomez, Mr. Lowe, and Safety Manager Glen Gunther.[50] Mr. Charron did not find unethical or unfair treatment of Mr. Fleet.[51]

During his investigation, Mr. Charron told Mr. Fleet on two occasions he could seek a reasonable accommodation for his diabetes by completing forms to CSX's medical department.[52] Mr. Fleet never completed the forms requesting an accommodation.[53] Mr. Fleet told Mr. Charron he (Mr. Fleet) did not have any further problems with his manager.[54]

### *December 30, 2016 incident resulting in a finding of Mr. Fleet's insubordination.*

On December 30, 2016, Mr. Fleet worked second shift with Mr. Gomez as supervisor.[55] During his shift, Mr. Fleet heard Mr. Thompson make a comment over the radio about workers taking too many breaks.[56] Mr. Fleet perceived the comment to be directed to him regarding bathroom breaks.[57] Another intermodal service worker, Mike Pote, also commented over the radio calling Mr. Fleet a "bum" for taking breaks and telling Mr. Fleet to "stop bullshitting."[58] In response, Mr. Fleet told Mr. Pote over the radio to "stop bitching" and they would settle their dispute in person at a later time.[59] Mr. Fleet admits he and Mr. Pote had a "back and forth argument" over the radio, each exchanging "words" and "curs[ing] each other out."[60]

Between five and ten minutes later, Mr. Fleet left his work site in his truck and drove to Mr. Pote's location farther away in the rail yard.[61] Mr. Fleet approached Mr. Pote and asked him "what the real problem is, what's the situation, what's wrong."[62] Mr. Fleet and Mr. Pote "went back and forth" in argument, with Mr. Fleet ultimately leaving and telling Mr. Pote to "go get high."[63] At a subsequent investigation hearing, Mr. Fleet admitted when he approached Mr. Pote to talk, Mr. Pote said "no, not right now, . .. I don't feel like talking right now."[64]

6

Another intermodal service worker, John Boyer, witnessed the exchange between Mr. Fleet and Mr. Pote.[65] Mr. Boyer reported the incident to Mr. Gomez.[66] Mr. Gomez then spoke to both Mr. Fleet and Mr. Pote.[67] Mr. Fleet told Mr. Gomez he was tired of the "white guys getting away with everything."[68]

Mr. Gomez reported the incident to Mr. Lowe who, at the time, was on vacation.[69] Mr. Lowe directed Mr. Gomez to take witness statements and notify Regional Terminal Superintendent Abigail Beazley, Mr. Lowe's supervisor.[70] Ms. Beazley directed Mr. Gomez to collect witness statements.[71] Mr. Gomez took witness statements from all intermodal service workers on duty at the time of Mr. Fleet and Mr. Pote's encounter.[72]

There is no dispute Mr. Pote's witness statement is consistent with the statement he gave Mr. Gomez just after the encounter; Mr. Boyer's witness statement, the only other employee to witness the encounter, reports he (Mr. Boyer) "was in fear for Pote's safety . . . and believed [Mr. Fleet] was going to strike Pote"; and Mr. Fleet's written statement admits to arguing with Mr. Pote over the radio including telling Mr. Pote to "stop bitching" and the they would "talk about this like men in the trailer."[73] There is no dispute Mr. Gomez reviewed the witness statements, and discussed them with Ms. Beazley who concluded Mr. Fleet the aggressor in the encounter with Mr. Pote and directed Mr. Gomez to send Mr. Fleet home until his next scheduled shift.[74]

Mr. Gomez called Mr. Fleet into the terminal office and told him to leave work until his next scheduled shift.[75] There is no dispute Mr. Fleet did not immediately comply with Mr. Gomez's directive and instead argued with Mr. Gomez about the decision; demanded Mr. Gomez "call somebody" about the situation; and called Mr. Gomez a racist.[76] Although in his deposition Mr. Fleet described himself as "hot" in anger over being sent home, Mr. Fleet now denies "that he was 'hot'" and instead contends he "was upset" with Mr. Gomez because Mr.

7

Fleet believed Mr. Pote should have been sent home as well and Mr. Gomez favored Mr. Pote, a Caucasian employee.[77]

There is no dispute Mr. Fleet eventually left the Terminal office, but did not leave the Terminal itself, remaining in his car for approximately forty-five minutes.[78] There is no dispute when Mr. Gomez approached Mr. Fleet while sitting in his car, and again told Mr. Fleet to go home, Mr. Fleet became "very, very frustrated" and told Mr. Gomez the decision to send him home is "bullshit."[79] There is also no dispute Ms. Beazley overheard, through Mr. Gomez's Bluetooth headset, Mr. Gomez's interchange with Mr. Fleet, including Mr. Fleet's admitted "hollering at Gomez saying this is not cool, this is unfair, this is some bullshit" and his admittedly "loud tone" when expressing himself which – in Mr. Fleet's estimation - "doesn't necessarily mean that I'm aggressive."[80] Mr. Fleet ultimately left the workplace after being told several more times to leave.[81]

### *Mr. Fleet's dismissal after a formal investigation hearing with union representation.*

The next day, December 31, 2016, Ms. Beazley sent an email to Labor Relations Manager Liza Griffin, Mr. Lowe, Mr. Gomez, and Paul Hand, Ms. Beazley's supervisor at the time, recommending Mr. Fleet's termination because of his conduct towards Mr. Gomez.[82] Mr. Lowe, Ms. Beazley, Mr. Gomez, and Ms. Griffin conferred and concluded Mr. Fleet should be kept out of service pending a formal investigation.[83] Mr. Lowe told Mr. Fleet he would be held out of service pending an investigation into the December 30, 2016 incident.[84]

On January 6, 2017, Terminals charged Mr. Fleet with "insubordination, unprofessional conduct of an employee, conduct inimical to the company's interest, dereliction of duty, and violation of Safety Rule(s)" for his conduct towards Mr. Pote and Mr. Gomez on December 30, 2016.[85] Terminals simultaneously charged Mr. Pote with "unprofessional conduct of an

8

employee, conduct inimical to the company's interest, dereliction of duty, and violation of Safety Rule(s)," but did not charge him with insubordination.[86]

Terminals scheduled a formal investigation hearing on the charges against Mr. Fleet on January 13, 2017, later rescheduled for February 2, 2017 at the request of Mr. Fleet's union representative.[87] The February 2, 2017 hearing included charges against both Mr. Fleet and Mr. Pote.[88]

Melanie Margol, then Manager of Employee/Contractor Services, served as the Hearing Officer.[89] Hearing Officer Margol heard testimony from Mr. Gomez, Ms. Beazley, Mr. Boyer, Mr. Pote, and Mr. Fleet.[90] After reviewing hearing testimony and exhibits, Ms. Margol called Labor Relations Manager Griffin, who also reviewed the evidence, and the two determined the evidence showed Mr. Fleet's insubordination.[91] Terminals terminated Mr. Fleet's employment effective March 3, 2017.[92] There is no dispute, at the time of their decision to terminate Mr. Fleet, Hearing Officer Margol and Labor Relations Manager Griffin did not know he applied for or used FMLA leave.[93]

Hearing Officer Margol and Labor Relations Manager Griffin additionally determined the evidence showed Mr. Pote used profane and inappropriate language during his radio exchange with Mr. Fleet, finding he committed a "serious" offense under the Policy and assessed seven points against him.[94]

### *Mr. Fleet's EEOC Charge.*

On January 17, 2017, Mr. Fleet cross-filed a Charge of Discrimination with the Equal Employment Opportunity Commissions and the Pennsylvania Human Relations Commission against Terminals (the "Charge").[95] Mr. Fleet indicated "race" as the basis of discrimination, and stated his belief Terminals suspended him because of his race in violation of Title VII.[96] The

9

Charge listed the date of discrimination as only December 30, 2016.[97]  On May 10, 2017, the EEOC notified Mr. Fleet "there is no belief that your discharge was based upon your race" and issued a Right-to-Sue notice.[98]

### *Mr. Fleet's complaint in this Court.*

Mr. Fleet sues his former employer Terminals and supervisors Ryan Gomez and Jonathan Lowe, alleging discrimination and retaliation on the basis of race in violation of 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964,[99] the Pennsylvania Human Relations Act,[100] and the Philadelphia Fair Practices Ordinance,[101] aiding and abetting race discrimination in violation of the PHRA[102] and PFPO, and retaliation in violation of the Family Medical Leave Act.  We earlier dismissed all claims against Mr. Lowe alleging PHRA discrimination and FMLA retaliation and all claims based on Mr. Lowe's alleged conduct other than the December 30, 2016 incident.[103]

## II. Analysis[104]

Terminals and Messrs. Gomez and Lowe move for summary judgment on all of Mr. Fleet's claims arguing: (1) Mr. Fleet failed to exhaust his administrative remedies on most of his race discrimination claims, all of his retaliation claims, all disability discrimination claims, to the extent he pleaded any; (2) even if he exhausted his administrative remedies, Mr. Fleet cannot show discrimination in his termination; (3) Mr. Fleet cannot show retaliation for protected conduct; and (4) there is no evidence to hold Mr. Gomez or Mr. Lowe individually liable.

Viewing the facts and all reasonable inferences in the light most favorable to Mr. Fleet, there are no genuine issues of material fact and Mr. Fleet failed to adduce evidence sufficient to allow a reasonable jury to find in his favor.  A "mere scintilla of evidence" in Mr. Fleet's favor

does not create a genuine issue of material fact and he may not "rest on speculation and conjecture in opposing a motion for summary judgment."[105]

### A. Mr. Fleet failed to exhaust administrative remedies on his claims under Title VII, the PHRA, and PFPO.

Defendants argue summary judgment must be entered in their favor because Mr. Fleet failed to exhaust his administrative remedies on (1) race-based discrimination claims other than the December 30, 2016 incident; (2) any claims relating to disability as a diabetic; and (3) any retaliation claims brought under Title VII, the PHRA, and the PFPO.[106] Mr. Fleet elected not to respond to Defendants' argument on summary judgment or offer opposition to this exhaustion argument.

Before bringing an action in court seeking relief under Title VII, the PHRA, or PFPO, a plaintiff must first exhaust administrative remedies by filing a charge of discrimination with the EEOC or PHRA.[107] The test to determine whether a plaintiff exhausted his administrative remedies is "whether the acts alleged in the subsequent Title VII suit are fairly within the scope of the prior EEOC complaint, or the investigation arising therefrom."[108]

Defendants argue Mr. Fleet's Charge alleges only race discrimination, checking only the "race" box on the Charge and, in the "particulars" section, referring only to the December 30, 2016 incident as the basis of his belief Terminals terminated him because of his race.[109] Defendants argue the EEOC limited its investigation to whether Terminals terminated Mr. Fleet because of his race.

"[T]he mere failure to check a specific box on the EEOC charge form is not a fatal error, . . . [r]ather, '[t]he most important consideration in determining whether the plaintiff's judicial complaint is reasonably related to his EEOC charge is the factual statement.'"[110] "An EEOC

11

Charge Form serves to define the scope of the Commission's investigation and to notify the defendant of the charges against it."[111]

Reviewing Mr. Fleet's Charge, Mr. Fleet failed to exhaust claims for race-based discrimination or retaliation for conduct other than the December 30, 2016 incident and any claims relating to disability. With regard to the events other than the December 30, 2016 incident, Mr. Fleet's Third Amended Complaint alleges Defendants were aware he needed a reasonable accommodation to eat, drink, and take bathroom breaks because of his diabetes but nonetheless reprimanded him for eating a sandwich at the May 9, 2016 job safety meeting and Mr. Gomez followed Mr. Fleet when he required use of the bathroom.[112] These allegations are based on claims of disability discrimination, not race. The Charge does not mention disability. Mr. Fleet's Third Amended Complaint alleges retaliation for reporting discriminatory conduct and failure to accommodate his disability.[113] The Charge lacks retaliation allegations. Mr. Fleet elected not to check any box other than "race" and failed to provide facts in the "particulars" section other than the December 30, 2016 incident.

Claims for race-based discrimination other than the December 30, 2016 incident, disability-based discrimination, and retaliation cannot "reasonably be expected to grow out of the charge of discrimination."[114] Based on the Charge, Mr. Fleet did not exhaust his administrative remedies as required by Title VII and the PHRA. We grant Defendants' motion for summary judgment as to his Title VII, PHRA, and PFPO claims based on discrimination other than his race-based claim of discriminatory discharge relating to the December 30, 2016 incident.

**B. Even if Mr. Fleet exhausted his administrative remedies, summary judgment is entered in favor of Defendants on race-based discrimination claims under § 1981, Title VII, the PHRA, and PFPO.**

Even if Mr. Fleet administratively exhausted his race-based discrimination claims under Title VII, the PHRA, and PFPO they, along with Mr. Fleet's § 1981 claim, fail on summary judgment. Defendants argue they are entitled to summary judgment on Mr. Fleet's claims of race-based discrimination in the termination as a result of the December 30, 2016 incident and other claims of discrimination.

Race discrimination claims under Title VII, § 1981, the PHRA, and PFPO are all analyzed under the *McDonnell Douglas Corp. v. Green*[115] burden-shifting analysis.[116] Mr. Fleet does not suggest a different standard. Under the *McDonnell Douglas* framework, "a plaintiff first 'carr[ies] the initial burden . . . of establishing a prima facie case of racial discrimination.'"[117] To establish a *prima facie* case of discrimination, Mr. Fleet must show "(1) [he] is a member of a protected class; (2) [he] was qualified for the position he sought to attain or retain; (3) [he] suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination."[118]

If Mr. Fleet establishes a *prima facie* case of discrimination, the burden shifts to Terminals to articulate a legitimate, nondiscriminatory reason for terminating Mr. Fleet.[119] If Terminals articulates a legitimate, nondiscriminatory reason for terminating Mr. Fleet, the burden shifts back to Mr. Fleet to show Terminals' stated reason is pretext.[120] At summary judgment, Mr. Fleet can show pretext in two different ways: (1) he "may point to evidence in the record that would cause a reasonable juror to disbelieve the employer's legitimate nondiscriminatory reason, thereby creating a genuine dispute of material fact as to the credibility

13

of that reason" or (2) "by pointing to evidence that indicates that the employer acted with discriminatory animus."[121]

> **1. Mr. Fleet fails to meet his burden of showing pretext in Defendants' decision to terminate him for insubordination arising from the December 30, 2016 incident and we reject his newly raised hostile work environment claim.**

Defendants concede Mr. Fleet meets a *prima facie* case of discrimination arising from his termination. They argue he fails to show pretext in his termination arising from the December 30, 2016 incident and summary judgment must be awarded in their favor. We agree.

Defendants stated they terminated Mr. Fleet's employment due to his insubordination toward Mr. Gomez when directed to leave the workplace on December 30, 2016. It is Mr. Fleet's burden to show this reason is pretext for discrimination. He fails to do so.

Mr. Fleet concedes he did not comply with Mr. Gomez's directive to leave the workplace on December 30, 2016; he concedes he argued with Mr. Gomez about the decision to send him home that day; and he concedes he became "upset" and used a "loud tone" some might perceive as aggressive, including cursing and yelling at his supervisor Mr. Gomez. There is no dispute when Mr. Gomez approached Mr. Fleet to leave the workplace, Mr. Fleet became "very, very frustrated" and told Mr. Gomez the decision to send him home is "bullshit"[122] and admittedly "holler[ed] at Gomez saying this is not cool, this is unfair, this is some bullshit."[123]

Despite admitting his conduct, he denies insubordination, arguing he was not insubordinate, only upset about being sent home and justifies his admitted behavior to his belief race motivated the decision to send him home on December 30. But there is no evidence to meet either pretext prong of *Fuentes*; there is no evidence to disbelieve Terminals' articulated legitimate reason or to believe an invidious discriminatory animus is more likely than not a motivating or determinative cause of Mr. Fleet's termination.

14

Mr. Fleet does not address the pretext argument. Instead, he raises, for the first time in his response to summary judgment, a hostile work environment claim on the basis of race. Mr. Fleet did not include a hostile work environment claim in his EEOC Charge, there is no hostile work environment claim pleaded in the Third Amended Complaint, and he cannot raise the claim now.[124] Even if he could now raise a hostile work environment claim, Mr. Fleet must show "(1) [he] suffered intentional discrimination because of [his] [race]; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected [him]; (4) the discrimination would detrimentally affect a reasonable person in like circumstances; and (5) the existence of *respondeat superior* liability [meaning the employer is responsible.]"[125] We find no such evidence for the same reasons we do not find pretext on Mr. Fleet's discrimination claims

To show discrimination surrounding the December 30, 2016 incident, Mr. Fleet points to Mr. Pote, who is Caucasian, as a comparator.[126] Mr. Fleet argues Terminals did not terminate Mr. Pote despite Mr. Pote's earlier major offense for failing a drug screening at the time of the December 30, 2016 incident resulting in a "last chance agreement."[127] Mr. Fleet contends Mr. Pote had a previous major offense while Mr. Fleet did not.

The record, however, shows Mr. Fleet had a previous major offense on his disciplinary record for a verbal altercation with co-worker John Boyer in March 2016.[128] Terminals argues the "last chance agreement" expressly provided Mr. Pote would be dismissed only for a subsequent "major" rule violation.[129] Mr. Pote's violations with regard to his conduct on December 30, 2016 constituted a "serious," not "major" offense under Terminals' Policy.[130] Terminals disciplined Mr. Pote for his conduct in the December 30 incident. But Mr. Pote did not commit insubordination – that is the difference between him and Mr. Fleet. Mr. Fleet does not address this distinction.

15

There is no evidence Terminals treated Caucasian intermodal service workers charged with insubordination more favorably than African American intermodal service workers charged with insubordination. The evidence shows insubordination is considered a "major" violation under Terminals' Discipline Policy meriting termination, and Terminals terminated Caucasian intermodal service worker, Patrick McDevitt, for insubordination a year earlier for failing to follow the instructions of his manager; acting unprofessionally towards his manager, Mr. Lowe; and failing to immediately leave the workplace when instructed to do so.[131]

Mr. Fleet also cites the testimony of witness John Boyer, a Caucasian, who witnessed the episode between Mr. Fleet and Mr. Pote, and who Mr. Fleet contends "had an axe to grind" from his March 2016 altercation with Mr. Fleet. Mr. Fleet contends Mr. Gomez took a witness statement from Mr. Boyer and "used it as the catalyst to place [Mr. Fleet] out of service." The evidence demonstrates otherwise. Terminals terminated Mr. Fleet after a formal investigation hearing where Mr. Fleet received union representation. There is no dispute Terminals investigated both Mr. Fleet and Mr. Pote; Hearing Officer Margol heard testimony from Mr. Gomez, Ms. Beazely, Mr. Boyer, Mr. Fleet, and Mr. Pote; and, after hearing, Hearing Officer Margol and Labor Relations Manager Griffin determined the evidence demonstrated Mr. Fleet's insubordination.

He also contends Terminals failed to investigate the complaints he made to Mr. Gomez on December 30, 2016 regarding disparate treatment, and overheard by Ms. Beazley. Mr. Fleet contends Defendants failed to take reasonable measures to investigate his complaints instead "blam[ing] his anger and passion on December 30, 2016, as an insubordination."

We construe Mr. Fleet's "failure to investigate" argument as going to Terminals' *respondeat superior* liability in his newly advanced hostile work environment claim. Where

16

harassment is reported to an employer, a failure to investigate and remediate will result in employer liability.[132] Even if this argument had anything to do with a race-based disparate treatment claim, we find it is without merit.

The evidence of record shows Terminals investigated his November 6, 2016 complaints to the ethics hotline. It is undisputed Terminals' Employee Relations Manager Matthew Charron investigated Mr. Fleet's claims, interviewing Mr. Fleet, Mr. Gomez, Mr. Lowe, and a Safety Manager.[133] Mr. Fleet told Mr. Charron he (Mr. Fleet) did not have any further problems with his manager.[134] Neither Mr. Gomez nor Mr. Lowe, nor anyone at Terminals, ever counseled or disciplined Mr. Fleet for taking a bathroom break.[135] As to complaints made to Mr. Gomez on December 30 and overheard by Ms. Beazley, Terminals held a hearing and took evidence including Mr. Fleet's assertion Caucasian employees received favorable treatment. Mr. Fleet's union representative at the hearing had the opportunity to cross-examine Terminals' witnesses.

Mr. Fleet offers no evidence Terminals' articulated basis for Mr. Fleet's termination is pretextual. He cites only his affidavit filed in opposition to summary judgment swearing to his belief of unfavorable treatment in comparison to similarly situated Caucasian co-workers.[136] He may not rely on his Declaration relying on his "belief" of unfavorable treatment in comparison to similarly situated Caucasian intermodal service workers to defeat summary judgment.[137] There is no evidence in the record to cause a reasonable juror to disbelieve Terminals' legitimate nondiscriminatory reason for Mr. Fleet's termination for insubordination to create a genuine dispute of material fact as to the credibility of that reason or evidence to indicate Terminals acted with discriminatory animus. Terminals terminated Mr. Fleet because of his insubordinate conduct with regard to his supervisor, Mr. Gomez. Mr. Fleet does not deny this but seeks to justify himself because he became emotionally upset. Terminals terminated Mr. Fleet consistent

with its Policy. It is undisputed Terminals terminated a Caucasian intermodal service worker for similar insubordinate conduct a year earlier. We grant summary judgment in favor of Defendants on Mr. Fleet's race discrimination claims under § 1981; Title VII, the PHRA, and the PFPO relating to the December 30, 2016 incident resulting in his termination.

### 2. Mr. Fleet fails to meet a *prima facie* case as to the remaining claims of discrimination and, even if he carried his burden of showing a *prima facie* case, he fails to meet his burden of showing pretext.

Defendants next argue Mr. Fleet's remaining claims of discrimination – written counseling for eating a sandwich at the job safety meeting and following him to the bathroom – fail to meet a *prima facie* case of discrimination and, even if he could make out a *prima facie* case, he fails to meet his burden of showing pretext.

Defendants first argue Mr. Fleet fails to meet the third prong of the *prima facie* case because he did not suffer an adverse employment action. Defendants argue a written reprimand for eating a sandwich at the job safety meeting and being followed to the bathroom are not adverse employment actions. An "adverse employment action" is defined by our court of appeals as "an action by an employer that is 'serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment.'"[138] Defendants argue reprimands and counseling, even in a progressive disciplinary policy, and being observed at work, are not adverse employment actions. Mr. Fleet does not respond to this argument.

Our court of appeals and courts in this Circuit find actions such as performance improvement plans, negative reviews, verbal reprimands, and "write-ups" do not constitute adverse employment actions under Title VII without some "material change in the terms or conditions of his employment."[139] There is no evidence Mr. Fleet suffered a change in his employment status as a result of the written counseling or being followed on bathroom breaks

18

sufficient to constitute an adverse employment action. Mr. Fleet concedes Terminals never counseled or disciplined him for taking bathroom breaks.[140] He fails to satisfy the third prong of the *prima facie* case.

Even if the written counseling constitutes an adverse employment action, there is no evidence of pretext. Mr. Fleet cites Jim Thompson, a Caucasian intermodal service worker, who finished a sandwich as a job safety meeting began but who did not receive written counseling. Defendants explain Mr. Thompson did not receive written counseling, receiving instead only verbal correction by Mr. Gomez, because Mr. Thompson finished eating as the meeting began.[141] Mr. Fleet disputes this reason, attributing the difference in treatment to Mr. Gomez's "pattern of treating Caucasian workers more favorably than African American workers ...."[142] But Mr. Fleet does not adduce evidence of a "pattern" of disparate treatment. Mr. Fleet must point to some evidence in the record to "allow a factfinder reasonably to infer that *each* of the employer's proffered non-discriminatory reasons . . . was either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)."[143] The "factual dispute at issue is whether discriminatory animus motivated" Terminals, not whether its decision is wrong or mistaken, and Mr. Fleet must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Terminals' "proffered legitimate reasons that a reasonable factfinder could rationally find them 'unworthy of credence.'"[144]

Mr. Fleet similarly fails to show pretext in his other claim of discrimination – being followed to the bathroom by Mr. Gomez. Mr. Fleet does not deny Mr. Gomez's responsibilities include monitoring the work of intermodal service workers.[145] He does not deny Mr. Gomez followed or "watched" other intermodal service workers.[146] Instead, he draws a distinction

19

between being followed and watched at work and being followed to the bathroom.[147] But Mr. Fleet points to no evidence, aside from the bare allegation of his Declaration, Mr. Gomez's following him to the bathroom is motivated by discriminatory animus. To the contrary, the evidence shows Mr. Fleet admits Mr. Gomez followed or watched other intermodal service workers and Terminals never counseled or disciplined him for taking a bathroom break.[148]

### C. Even if Mr. Fleet administratively exhausted his retaliation claims, summary judgment is entered in favor of Defendants on retaliation claims under § 1981, Title VII, PHRA, PFPO, and FMLA.

Mr. Fleet did not exhaust his administrative remedies on any retaliation claim under §1981, Title VII, the PHRA, and PFPO as required and we would grant summary judgment to Defendants on those claims. Even if we found Mr. Fleet exhausted his retaliation claims under these statutes, we find he does not meet his burden on summary judgment.

Mr. Fleet asserts Defendants retaliated against him for filing a complaint with the ethics hotline in November 2016 and complaining to Mr. Gomez about race discrimination in the decision to send him, but not Mr. Pote, home from work on December 30, 2016. Mr. Fleet additionally claims Defendants retaliated against him for taking intermittent FMLA leave beginning November 2016.

We apply the *McDonnell Douglas* burden-shifting framework to retaliation claims.[149] Retaliation claims under § 1981 carry the additional requirement of showing an underlying § 1981 violation.[150]

To establish a *prima facie* case of retaliation, Mr. Fleet must show he (1) engaged in protected activity; (2) Terminals took an adverse employment action against him; and (3) there is a causal connection between Mr. Fleet's participation in protected activity and the adverse employment action.[151] An "adverse action" in retaliation claims is not limited to actions

20

affecting the "terms and conditions of employment"; rather, a plaintiff can show an adverse employment action if "a reasonable employee would have found the alleged retaliatory actions 'materially adverse' in that they 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"[152] "To establish the requisite causal connection a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link."[153] In the absence of proving either temporal proximity or a pattern of antagonism, "a plaintiff must show that from the 'evidence gleaned from the record as a whole' the trier of fact should infer causation."[154]

The *prima facie* case for retaliation under the FMLA requires Mr. Fleet to show (1) he is protected under the FMLA; (2) he suffered an adverse employment action; and (3) a causal relationship exists between the decision to terminate him and the exercise of his FMLA rights.[155]

If Mr. Fleet establishes a *prima facie* case, the burden shifts to Defendants to articulate a legitimate, non-retaliatory reason for the adverse employment action.[156] If Defendants do so, the burden shifts back to Mr. Fleet "to convince the factfinder both that [Terminals'] proffered explanation was false [that is, a pretext], and that retaliation was the real reason for the adverse employment action."[157]

### 1. Mr. Fleet's FMLA retaliation claim fails because there is no causal relationship between his termination and exercise of FMLA rights.

Mr. Fleet argues Mr. Lowe and Mr. Gomez put him out of service on December 30, 2016 knowing Mr. Fleet took intermittent FMLA leave in November and December 2016. Mr. Fleet contends the December 30 verbal altercation with Mr. Pote arose because Caucasian employees complained of Mr. Fleet's breaks. He points to Mr. Gomez who testified at his deposition frequent breaks "were getting to a point where it was hurting the morale of the whole team."[158]

Mr. Fleet then reasons "in an effort to increase the morale and alleviate the morale issue, Defendant *could certainly have* retaliated against Plaintiff and similarly situated co-workers like Brian White, who used intermittent FMLA leave."[159]

This is conjecture. There is no evidence Mr. Gomez sent Mr. Fleet home after the December 30 incident in retaliation for taking FMLA leave. Mr. Fleet does not articulate a connection between taking bathroom breaks and taking intermittent FMLA leave. Although Mr. Fleet refers to Terminals firing an African American Brian White for taking intermittent FMLA leave, he adduces no evidence of the circumstances surrounding Mr. White's termination. At his deposition, Mr. Fleet admitted Mr. White had "some FMLA issues, and he had some other disciplinary stuff going on" but admittedly did not know "the exact extent of it, but I do know about some of it being a part of his FMLA situation."[160] Mr. Fleet failed to develop evidence regarding Mr. White during discovery.

The evidence shows neither Hearing Officer Margol nor Labor Relations Manager Griffin knew Mr. Fleet took FMLA leave, a fact he does not dispute, but attempts to minimize by attributing Mr. Gomez's and Ms. Beazley's knowledge of FMLA leave into their hearing testimony considered by Ms. Margol and Ms. Griffin in making their termination decision. A review of the hearing transcript does not show reference by either Mr. Gomez or Ms. Beazley to FMLA leave, and Mr. Fleet's union representative did not question either Mr. Gomez or Ms. Beazley about FMLA leave. Mr. Fleet fails to show a causal relationship between the decision to terminate him and the exercise of his FMLA rights.

## 2. Mr. Fleet's retaliation claims under § 1981, Title VII, PHRA, and PFPO fail because he does not show a causal connection between his protected activity and termination and he fails to show pretext.

Mr. Fleet contends Defendants retaliated against him for filing a complaint with the ethics hotline in November 2016 and complaining to Mr. Gomez about race discrimination in the decision to send him, but not Mr. Pote, home on December 30, 2016.

Defendants argue they are entitled to summary judgment on the retaliation claims because Mr. Fleet's call to the ethics hotline related to disability, not race, and even if protected activity, Mr. Fleet cannot show retaliation; there is no temporal proximity between the protected activity and termination; and, Mr. Fleet cannot show pretext.

Addressing the call to the ethics hotline first, Mr. Fleet fails to establish a causal connection between his call and his termination. First, Mr. Fleet admits he called the ethics hotline to report discrimination based on his diabetic disability, not race. He complained about written counseling for eating a sandwich at the safety meeting and for being followed to the bathroom by Mr. Gomez. Because his call to the ethics hotline, a protected activity, pertained to disability, not race, it cannot be the basis for his §1981 or Title VII claims because those statutes prohibit discrimination based on race, and not disability. To the extent the call to the ethics hotline pertains to his PHRA and PFPO claims, which prohibits discrimination including on the basis of race and disability, Mr. Fleet fails to show a causal connection between the two events.

To establish the requisite causal connection, Mr. Fleet must show an unusually suggestive temporal proximity, a pattern of antagonism coupled with temporal proximity, or, in the absence of either temporal proximity or a pattern of antagonism, evidence from the record as a whole sufficient to allow a jury to infer causation. Mr. Fleet does not address Defendants' causation argument.

23

Mr. Fleet called the ethics hotline on November 8, 2016, seven weeks before the December 30, 2016 incident. Although our court of appeals does not have a "bright line rule as to what constitutes unduly suggestive temporal proximity,"[161] the time is measured in days, not weeks or months to suggest causation without corroborative evidence.[162] We do not find the passage of seven weeks "unusually suggestive temporal proximity." Mr. Fleet does not adduce evidence of a pattern of antagonism or any evidence sufficient to allow a jury to infer causation. To the contrary, the record shows Terminals' Employee Relations Manager Matthew Charron investigated Mr. Fleet's call to the ethics hotline and found no unfair or unethical treatment. It is undisputed Mr. Fleet told Mr. Charron he had no further problems with Mr. Gomez since his complaint to the ethics hotline; Mr. Charron told Mr. Fleet he could request an accommodation for his diabetes; both Mr. Lowe and Mr. Gomez testified they told Mr. Fleet he could request an accommodation for his disability; and, Mr. Fleet never requested an accommodation.[163] The record does not support a claim for retaliation based on the call to the ethics hotline.

We next address Mr. Fleet's claim of retaliation based on complaints of race discrimination. Mr. Fleet's opposition to summary judgment is less than clear on when he made complaints of race discrimination: on one hand he asserts, without citation to the record, he "consistently complained that he was being discriminated and harassed based on his diabetic disability and race" and "on multiple occasions, [he] explained to Defendant Lowe that he felt Defendant Gomez was singling him out because of his race and because he felt that Defendant Gomez favored Caucasian workers,"[164] and on the other hand, in the retaliation section of his brief, he asserts he complained of race discrimination contemporaneously with the December 30, 2016 incident when he accused Mr. Gomez of sending him home, but not sending Mr. Pote

24

home, because of race and complained to Ms. Beazley about race-based discrimination in a December 31, 2016 email.[165]

Mr. Fleet argues Terminals never investigated his complaints of discrimination made to Mr. Gomez on December 30, suggesting an attempt to hold Terminals liable on a hostile work environment theory which is not an issue in this case.[166] Even applying Mr. Fleet's lack of investigation argument to his retaliation claims, it fails. A deficient investigation does not constitute an adverse employment action under a Title VII retaliation claim.[167]

Mr. Fleet argues Ms. Beazley's email, written after she heard Mr. Fleet's exchange with Mr. Gomez, recommending termination shows her opinion "*could be* shrouded in her perception that [Mr. Fleet] was a liability to the company because he was complaining of discrimination."[168] It is Mr. Fleet's burden to point to evidence in the record creating a genuine issue of material fact on pretext. Ms. Beazley's uncontroverted testimony is she heard Mr. Fleet speaking to Mr. Gomez in an "unprofessional way" and Mr. Fleet "was not in control of his emotions, was very unprofessional, was screaming."[169] Ms. Beazley testified she found Mr. Fleet's exchange with Mr. Gomez so threatening, she "was about to call the police . . . [and] called her boss and said this is going on, I'm placing this employee out of service; I'm very concerned about what's going on at that ramp right now."[170] Ms. Beazley recommended Mr. Fleet's termination in emails sent the next day, December 31, based on the exchange between Mr. Fleet and Mr. Gomez she overheard.[171] Mr. Fleet provides no evidence creating a genuine issue of material fact Ms. Beazley's description of him as "a cancer to the workforce" is in retaliation for his complaints of discrimination.

Mr. Fleet points to Mr. Pote's disciplinary record and the termination of another African American employee, Ray Walker. But Mr. Fleet ignores the evidence Mr. Pote received

25

discipline for his role in the December 30, 2016 incident; Mr. Pote did not act in an insubordinate manner; and, Terminals terminated a Caucasian employee for insubordination a year earlier. Mr. Walker is not a comparator. Mr. Gomez testified he found Mr. Walker going through Mr. Gomez's briefcase on December 30 and making copies of the witness statements Mr. Gomez obtained about the incident, taking the original statements and putting them in his locker.[172] Terminals terminated Mr. Walker for this conduct after investigation and hearing.[173]

Terminals terminated Mr. Fleet after investigation and hearing for insubordination, a legitimate, non-retaliatory reason for termination. Mr. Fleet fails to carry his burden of showing Terminals' proffered explanation is false and retaliation is the real reason for termination. We grant summary judgment in favor of Defendants on all retaliation claims.

### D. Mr. Gomez and Mr. Lowe are not personally liable under § 1981, PHRA, PFPO, and FMLA or under an aiding and abetting theory.

Mr. Gomez and Mr. Lowe move for summary judgment on the claims against them individually and on aiding and abetting claims. Mr. Fleet seeks to hold Mr. Gomez and Mr. Lowe liable under §1981, the PHRA, PFPO, and the FMLA and to hold them liable for aiding and abetting discriminatory practices under the PHRA and PFPO.

#### 1. There is no evidence to hold Mr. Gomez and Mr. Lowe personally liable.

Mr. Fleet responds only to individual liability of Mr. Gomez and Mr. Lowe under § 1981. "[L]iability under §1981 cannot be imposed vicariously" and to maintain a claim against an individual under §1981, "evidence of 'personal involvement is essential.'"[174] Mr. Fleet argues Mr. Gomez and Mr. Lowe are individually liable under §1981 on a "cat's paw" theory of liability. Under the "cat's paw" theory, a plaintiff employee may hold his employer liable "for employment discrimination based on the discriminatory animus of an employee who influenced, but did not make, the ultimate employment decision."[175] The theory is used to hold an *employer*

26

liable where the decisionmakers (here, Hearing Officer Margol and Labor Relations Manager Griffin) are free from discriminatory animus but whose actions are influenced by other employees (here, Mr. Lowe and Mr. Gomez) who are allegedly motivated by discriminatory animus.[176] The cat's paw theory does not work to hold Mr. Lowe and Mr. Gomez liable; their liability must be predicated on their personal involvement in the alleged discrimination with "some affirmative link to causally connect the actor with the discriminatory action."[177] Mr. Fleet fails to adduce evidence to create a genuine issue of material fact on either Mr. Lowe's or Mr. Gomez's personal involvement causally connecting them with the alleged discrimination.

As to Mr. Lowe, Mr. Fleet testified "I never said that Jonathan Lowe discriminated against me based on my race," and instead attributed discrimination to Mr. Gomez.[178] Mr. Fleet does not deny his testimony and fails to adduce evidence of Mr. Lowe's personal involvement in race-based discrimination. We previously dismissed all claims against Mr. Lowe except for claims relating to the December 30, 2016 incident. Mr. Fleet does not point to evidence of Mr. Lowe's personal involvement in any race-based discrimination relating to the December 30, 2016 incident. Mr. Fleet could not identify conduct by Mr. Lowe in violation of law.[179] Instead, Mr. Fleet testified Mr. Lowe took action against him because of his medical condition, testifying he complained to Mr. Lowe about symptoms of his uncontrolled blood sugar and Mr. Lowe refused to allow Mr. Fleet to see a doctor.[180] To the extent this testimony relates to claims of disability-based discrimination or retaliation, the record does not support any such claim. There is no dispute when Mr. Fleet reported to Mr. Lowe numbness in his hands, blurry vision, and the need to see a doctor, Mr. Lowe put Mr. Fleet out of work.[181] Mr. Lowe completed a "Withheld from Service Form" the same day attributing the reason for removal to Mr. Fleet's high blood sugar, and prepared a letter to Mr. Fleet's doctor asking for an evaluation of Mr. Fleet's ability to

safely return to work.[182] At his deposition, Mr. Fleet testified Mr. Lowe put him out of service in October 2016 because of safety issues, and not as discipline.[183] When Mr. Fleet's doctor reported Mr. Fleet could return to work without restriction, Terminals returned Mr. Fleet to work.[184]

As for Mr. Gomez, Mr. Fleet argues he is personally liable because Mr. Gomez "ha[d] input into [Mr. Fleet's] ongoing employment and as a result could have been and was unlawfully discriminated against, retaliated against and ultimately terminated by Defendants." But Mr. Fleet does not explain or show evidence of Mr. Gomez's personal involvement in any discrimination. Mr. Fleet does not deny Hearing Officer Margol and Labor Relations Manager Griffin made the decision to terminate Mr. Fleet after hearing and finding his insubordination toward Mr. Gomez the determinative factor in the termination decision.[185]

### 2. Mr. Fleet's aiding and abetting discriminatory practices claims under the PHRA and PFPO fail because his discrimination claims fail.

Mr. Fleet's claims of aiding and abetting a discriminatory practice under § 955(e) of the PHRA and § 9-1103(1)(h) of the PFPO do not survive summary judgment.[186] Mr. Lowe and Mr. Gomez argue they cannot be held liable for aiding and abetting Terminals where Mr. Fleet fails to establish discrimination by Terminals. Mr. Fleet does not respond to this argument. Because we find Mr. Fleet does not meet his burden of showing any discriminatory practice by Terminals, neither Mr. Lowe nor Mr. Gomez can be liable for aiding and abetting a discriminatory practice.[187] Mr. Fleet's claims against Terminals for aiding and abetting a discriminatory practice are also dismissed.

28

## III. Conclusion

Mr. Fleet fails to adduce evidence to meet his burden to show genuinely disputed issues of material fact precluding the entry of judgment. His theories are not sufficient to warrant a trial. We enter judgment in favor of all Defendants in the accompanying Order.

---

[1] Our Policies require a Statement of Undisputed Material Facts ("SUMF") and an appendix in support of summary judgment. Defendants filed their SUMF and appendix at ECF Doc. Nos. 55-1, 55-4 through 55-11. Mr. Fleet responded to Defendants' SUMF, added additional facts he contends are material to summary judgment, and supplemented the appendix with additional exhibits (ECF Doc. No. 56-2, 56-4). Defendants replied, adding an additional document to the appendix (ECF Doc. No. 57). References to exhibits in the appendices shall be referred to by Bates number, for example, "Appx. 1a."

[2] SUMF at ¶ 2 (ECF Doc. No. 55-1).

[3] *Id.* at ¶ 1.

[4] *Id.* at ¶ 4.

[5] *Id.* at ¶ 5.

[6] *Id.* at ¶ 6.

[7] *Id.*

[8] *Id.* at ¶¶ 17, 18.

[9] *Id.* at ¶ 23. Terminals counseled both Mr. Fleet and the co-worker, John Boyer. Appx. 256a, 258a.

[10] *Id.* .

[11] *Id.* at ¶¶ 24-28; Appx. 254a, 260a, 262a-263a, 265a, 267a.

[12] *Id.* at ¶ 31.

[13] *Id.* at ¶ 30.

[14] *Id.*

[15] *Id.* at ¶ 32.

[16] *Id.*

[17] *Id.* at ¶¶ 33-34; Appx. 260a.

[18] *Id.* at ¶ 36.

[19] *Id.*

[20] *Id.*

[21] *Id.*

[22] Plaintiff's Response to SUMF at ¶ 36 (ECF Doc. No. 56-2).

[23] SUMF at ¶ 19.

[24] Appx. 245a.

[25] *Id.*

[26] Appx. 246a. Major offenses include, but are not limited to, "willful disregard to the rights of the Company or other employees (e.g. assault, dishonesty, theft, etc.)"; insubordination; violation of the Company's Violence in the Workplace policy and the Company's Drug/Alcohol policy; "abusive or unprofessional conduct toward customers/vendors or conduct undermining customer/vendor confidence in the Company"; and other safety related offenses. Appx. 249a.

[27] SUMF at ¶ 19; Appx. 248a.

30

[28] *Id.*

[29] *Id.*

[30] *Id.* at ¶ 21.

[31] Appx. 245a.

[32] SUMF at ¶ 20.

[33] *Id.*

[34] *Id.*

[35] *Id.*; Appx. 139a at ¶ 9.

[36] SUMF at ¶ ¶ 56, 58; Appx. 317a-319a.

[37] SUMF at ¶¶ 56-58.

[38] *Id.* at ¶ 57.

[39] *Id.* at ¶ 58.

[40] *Id.* at ¶ 59.

[41] *Id.* at ¶ 37.

[42] *Id* at ¶¶ 37-38; Appx. 272a-273a.

[43] SUMF at ¶ 37; Appx. 48a at pp. 163-164.

[44] SUMF at ¶¶ 39-41.

[45] Appx. at 306a.

[46] SUMF at ¶¶ 60-61.

[47] *Id.* at ¶¶ 42-43.

[48] *Id.* at ¶ 42; Appx. 48a at p. 165.

[49] SUMF at ¶ 44.

[50] *Id.*; Appx. 285 at ¶ 5.

[51] SUMF at ¶ 45; Appx. 285a at ¶ 6.

[52] SUMF at ¶ 47.

[53] *Id.* at ¶ 49.

[54] *Id.* at ¶ 46; Appx. 66a-63a at pp. 221-222.

[55] *Id.* at ¶ 63.

[56] *Id.* at ¶ 64.

[57] *Id.*; Appx. 35a at pp. 111-113.

[58] SUMF at ¶ 64; Appx. 35a at pp. 113-114.

[59] *Id.*; Appx. 35a at p. 112; 321a.

[60] SUMF at ¶ 64; Appx. 37a at pp. 119-120.

[61] Appx. 37a at pp. 120-121; Appx. 40a at p. 130.

[62] SUMF at ¶ 65; Appx. 38a at pp. 123-124.

[63] *Id.*

[64] SUMF at ¶ 65; Appx. 415a at p. 90.

[65] SUMF at ¶ 66.

[66] *Id.* at ¶ 67.

[67] *Id.* at ¶¶ 68-69.

[68] *Id.* at ¶ 69.

[69] *Id.* at ¶ 70.

[70] *Id.*

[71] *Id.*

[72] *Id.* at ¶ 72.

[73] *Id.* at ¶¶ 73-75.

[74] *Id.* at ¶ 76.

[75] *Id.*

[76] *Id.* at ¶ 78.

[77] *Id.*; compare Fleet deposition transcript at Appx. 40a at p. 132 with Response to SUMF at ¶ 78.

[78] *Id.* at ¶ 79.

[79] *Id.* at ¶ 80.

[80] *Id.* at ¶¶ 81-82; Appx. 44a-45a at pp. 149-50.

[81] *Id.* at ¶ 83.

[82] *Id.* at ¶ 84.

[83] *Id.* at ¶ 85.

[84] *Id.*

[85] *Id.* at ¶ 86; Appx. 452a.

[86] *Id.* at ¶ 87; Appx. 454a.

[87] *Id.* at ¶¶ 88-89.

[88] *Id.* at ¶ 90.

[89] *Id.*

[90] *Id.* at ¶¶ 91-98.

[91] *Id.* at ¶ 100. Terminals adduced undisputed evidence of treating a Caucasian employee in a similar manner. There is no dispute on June 10, 2015, Terminals dismissed employee Patrick McDevitt, a Caucasian intermodal service worker, for failing to follow the instructions of his manager; acting unprofessionally towards his manager, Mr. Lowe; and failing to immediately leave the premises when instructed to do so. *Id.* at ¶ 106; Appx. 481a-482a.

[92] *Id.*.

[93] *Id.* at ¶ 101.

[94] *Id.* at ¶ 102.

[95] *Id.* at ¶ 107.

[96] *Id.* at ¶¶ 108-109; Appx. 473a.

[97] *Id.* at ¶ 110; Appx. 473a.

[98] *Id.* at ¶¶ 112-113; Appx. 476a, 479a.

[99] 42 U.S.C. § 2000e *et seq.* Mr. Fleet's Title VII discrimination and retaliation claims are against Terminals only.

[100] 43 P.S. § 955(a), (d).

[101] § 9-1100 *et seq.*

[102] 43 P.S. § 955(e).

[103] ECF Doc. No. 40.

[104] Summary judgment is proper when "the movant shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(a). "Material facts are those 'that could affect the outcome' of the proceeding, and 'a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party.'" *Pearson v. Prison Health Serv.*, 850 F.3d 526, 534 (3d Cir. 2017) (quoting *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011)). On a motion for summary judgment, "we view the facts and draw all reasonable inferences in the light most favorable to the nonmovant." *Pearson*, 850 F.3d at 533-34 (3d Cir. 2017) (citing *Scott v. Harris*, 550 U.S. 372, 378 (2007)). "The party seeking summary judgment 'has the burden of demonstrating that the evidentiary record presents no genuine issue of material fact.'" *Parkell v. Danberg*, 833 F.3d 313, 323 (3d Cir. 2016) (quoting *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015)). If the movant carries its burden, "the nonmoving party must identify facts in the record that would enable them to make a sufficient showing on essential elements of their case for which they have the burden of proof." *Willis*, 808 F.3d at 643 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "If, after adequate time for discovery, the nonmoving party has not met its burden, pursuant to Federal Rule of Civil Procedure 56, the court must enter summary judgment against the nonmoving party." *Willis*, 808 F.3d at 643 (citing *Celotex Corp.*, 477 U.S. at 322-323).

[105] *Ramara, Inc. v. Westfield Ins. Co.*, 814 F.3d 660, 666 (3d Cir. 2016) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) and *Acumed LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 228 (3d Cir. 2009)).

[106] Defendants' exhaustion argument does not apply to Mr. Fleet's race based claims under § 1981. Claims under § 1981 do not require exhaustion of administrative remedies. *Collins v. Kimberly-Clark Pa., LLC*, 247 F.Supp.3d 571, 588 (E.D. Pa. 2017) (quoting *Ingram v. Vanguard Grp., Inc.*, No. 14-3674, 2015 WL 4394274, at \*9 n.11 (E.D. Pa. July 17, 2015)).

[107] *Barzanty v. Verizon PA, Inc.*, 361 F.App'x 411, 413 (3d Cir. 2010) (before bringing suit for discrimination under Title VII, plaintiff must exhaust administrative remedies by filing a timely charge with the EEOC); *Mandel v. M&Q Packaging Corp.*, 706 F.3d 157, 163 (3d Cir. 2013) (exhaustion of administrative remedies required to bring a claim under the PHRA). Although the Pennsylvania Supreme Court has not decided whether the PFPO requires exhaustion of administrative remedies prior to bring claims, courts within our district and the Pennsylvania Commonwealth Court require exhaustion under the PFPO. *Vazquez v. Carr and Duff, Inc.*, No. 16-1727, 2017 WL 4310253, at \* 8 (E.D. Pa. Sept. 28, 2017) (citing *Ives v. NHS Human Servs.*, No. 15-5317, 2016 WL 4039644, at \*3 (E.D. Pa. July 27, 2016)); *Ahern*, 183 F.Supp. 3d at 668 (citing *Richards v. Foulke Assocs., Inc.*, 151 F.Supp. 2d 610, 616 (E.D. Pa. 2001); *Marriott Corp. v. Alexander*, 799 A.2d 205, 208 (Pa. Commw. Ct. 2002) (adopting *Richards*).

[108] *Antol v. Perry*, 82 F.3d 1291, 1295 (3d Cir. 1996) (quoting *Waiters v. Parsons*, 729 F.2d 233, 237 (3d Cir. 1984)).

[109] Appx. 473a.

[110] *Blassingame v. Sovereign Sec., LLC*, No. 17- 1351, 2017 WL 3390199, at \* 4 (E.D. Pa. Aug. 7, 2017) (quoting *Doe v. Kohn Nast & Graf, P.C.*, 866 F.Supp. 190, 196 n.2, 197 (E.D. Pa. 1994)).

[111] *Barzanty*, 361 F.App'x at 415 (citing 42 U.S.C. § 2000e-5(b)).

[112] ECF Doc. No. 33 at ¶¶ 26-35.

[113] *Id.* at ¶ 48.

[114] *Hicks v. ABT Assocs., Inc.*, 572 F.2d 960, 966 (3d Cir. 1978) (quoting *Ostapowicz v. Johnson Bronze Co.*, 541 F.2d 394, 398-99 (3d Cir. 1976)).

[115] 411 U.S. 782 (1973).

[116] *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir. 1999); *see also Vaughn v. Boeing Co.*, --- F.App'x ---, 2018 WL 2324224, \*3 n.4 (3d Cir. May 22, 2018) ("the substantive elements of a claim under §1981 are generally identical to the elements of an employment discrimination claim under Title VII" and "the same is true for claims brought pursuant to the PHRA") (citing *Brown v. J. Kaz, Inc.*, 581 F.3d 175, 181-82 (3d Cir. 2009) and *Atkinson v. Lafayette Coll.*, 460 F.3d 447, 454 n.6 (3d Cir. 2006)); *Joseph v. Cont'l Airlines, Inc.*, 126 F.Supp.2d 373, 376 n. 3 (E.D. Pa. 2000) (Title VII analysis applied to §1981 and PFPO claims).

[117] *Vaughan,* 2018 WL 2324224 at *3 (quoting *McDonnell Douglas*, 411 U.S. at 802).

[118] *Id.* (quoting *Mandel*, 706 F.3d at 169).

[119] *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 802).

[120] *Id.*

[121] *Burton v. Teleflex Inc.*, 707 F.3d 417, 430-31 (3d Cir. 2013) (citing *Fuentes v. Perskie*, 32 F.3d 759, 764 and n.7 (3d Cir. 1994)).

[122] SUMF at ¶ 80.

[123] *Id.* at ¶¶ 81-82; Appx. 44a-45a at pp. 149-50.

[124] *Taylor v. Sanders*, 536 F.App'x 200, 203 (3d Cir. 2013) ("[a]t the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed.R.Civ.P. 15(a)") (quoting *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004)); *Sweet Street Desserts, Inc. v. Better Bakery, LLC*, No. 12-6115, 2015 WL 4486702, at *6 (E.D.Pa. July 23, 2015) ("[f]ederal pleading standards do not allow a party 'to raise new claims at the summary judgment stage'") (quoting *myService Force, Inc. v. Am. Home Shield*, No. 10-6793, 2013 WL 180287, at *12 (E.D. Pa. Jan. 17, 2013)).

[125] *Castleberry v. STI Grp.*, 863 F.3d 259, 263 (3d Cir. 2017) (quoting *Mandel*, 706 F.3d at 167). Mr. Fleet also failed to administratively exhaust a hostile work environment claim.

[126] Mr. Fleet's response is couched in a hostile work environment claim. We consider Mr. Fleet's arguments in the context of his disparate treatment claims.

[127] Appx. 567a.

[128] SUMF at ¶ 23; Appx. 254a; 256a. Terminals provided written counseling to Mr. Boyer for his role in the March 31, 2016 altercation with Mr. Fleet. Appx. 258a.

[129] Appx. 471a.

[130] SUMF at ¶ 102.

[131] *Id.* at ¶ 106; Appx. 481a-482a.

[132] *Bouton v. BMW. of N. Am., Inc.*, 29 F.3d 103, 107 (3d Cir. 1994).

[133] SUMF at ¶ 44; Appx. 285 at ¶ 5.

[134] *Id.* at ¶ 46; Appx. 66a-63a at pp. 221-222.

[135] SUMF at ¶ 55.

[136] Appx. 561a.

[137] *Lujan v. Nat'l Wildlife Fed'n*, 496 U.S. 871, 888 (1990) ("the object of [Rule 56] is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit").

[138] *Storey v. Burns Int'l Sec.Servs.*, 390 F.3d 760, 764 (3d Cir. 2004) (quoting *Cardenas v. Massey*, 269 F.3d 251, 263 (3d Cir. 2001)).

[139] *See Deans v. Kennedy House, Inc.*, 587 F.App'x 731, 734 (3d Cir. 2014) (oral and written warnings temporarily in plaintiff's file not an adverse employment action); *Reynolds v. Dept. of Army*, 439 F.App'x 150, 153 (3d Cir. 2011) (performance improvement plan is not an adverse action absent accompanying changes to pay, benefits, or employment status); *Yarnall v. Phila. Sch. Dist.*, 57 F.Supp. 3d 410, 422 (E.D. Pa. 2014) (verbal reprimands and "write-ups" do not constitute adverse employment actions under Title VII); *Brodgon v. Univ. of De.*, No. 13-1600, 2015 WL 167686, * 4 (D. Del. Jan. 13, 2015) ("Being called names, receiving negative reviews, and generally feeling ostracized, without more, do not amount to race-related discrimination.")

[140] SUMF at ¶ 55.

[141] SUMF at ¶ 36.

[142] Response to SUMF at ¶ 36.

[143] *Fuentes,* 32 F.3d at 764 (internal citations omitted) (emphasis in original).

[144] *Id.* (emphasis omitted) (citation omitted).

[145] SUMF at ¶ 51.

[146] Response to SUMF at ¶ 52.

[147] *Id.*; Appx. 50a-51a at pp. 172-175.

[148] SUMF at ¶¶ 52, 55.

[149] *Anderson v. Boeing Co.*, 694 F.App'x 84, 88 (3d Cir. 2017). Retaliation claims under Title VII, the PHRA , PFPO, and FMLA are all governed by the *McDonnell Douglas* framework. *Id.* at 88 n.11; *Daniels v. Sch. Dist. of Phila.*, 775 F.3d 181, 193 (3d Cir. 2015) (Title VII and PHRA claims analyzed under burden-shifting *McDonnell Douglas* framework); *Ahern v. Eresearch Tech., Inc.*, 183 F.Supp. 3d 663, 668 (E.D. Pa. 2016) (PFPO, Title VII, and PHRA interpreted in

the same way); *Capps v. Mondelez Global, LLC*, 847 F.3d 144, 151-52 (3d Cir. 2017) (FMLA retaliation claims assessed under burden-shifting *McDonnell Douglas* framework).

[150] *Anderson*, 694 F.App'x at 88 n. 11 (citing *Estate of Oliva v. State of NJ*, 604 F.3d 788, 798 (3d Cir. 2010)).

[151] *Moore v. City of Phila.*, 461 F.3d 331, 342 (3d Cir. 2006); *Sessoms v. Tr. of Univ. of Pa.*, --- F.App'x ---, 2018 WL 3060094, at *3 (3d Cir. June 20, 2018) (citing *Moore* for *prima facie* case of retaliation).

[152] *Moore*, 461 F.3d at 341 (quoting *Burlington N. & Sante Fe Ry. Co. v. White*, 548 U.S. 53, 60 (2006)).

[153] *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007) (citations omitted).

[154] *Id.* (citing *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000)).

[155] *Conoshenti v. Pub. Serv. Elect. & Gas Co.*, 364 F.3d 135, 146 (3d Cir. 2004).

[156] *Moore*, 461 F.3d at 342.

[157] *Carvalho-Grevious v. De. State Univ.*, 851 F.3d 249, 257 (3d Cir. 2017) (quoting *Moore*, 461 F.3d at 342)).

[158] Appx. 109a at p. 42.

[159] ECF Doc. No. 56 at 22 (emphasis added).

[160] Appx. 58a-59a at p. 205-206.
[161] *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 233 (3d Cir. 2007).

[162] *Rosati v. Colello*, 94 F.Supp.3d 704, 717 (E.D. Pa. 2015) (citations omitted); *Thornton v. Temple Univ. Health Sys., Inc.*, No. 2018 WL 585488, at * 3 (E.D. Pa. Jan. 29, 2018) (citations omitted).

[163] SUMF at ¶¶ 46-49.

[164] ECF Doc. No. 56 at p. 11.

[165] *Id.* at pp. 18-19.

[166] Mr. Fleet points to discrepancies between Mr. Lowe's and Mr. Gomez's deposition testimony: Mr. Lowe's testimony Mr. Fleet complained about Mr. Gomez's treatment of him before December 30, 2016 versus Mr. Gomez's testimony he did not have discussions with Mr.

Lowe about Mr. Fleet's complaints. *See* ECF Doc. No. 56 at p. 19. Mr. Fleet does not provide us with record cites. Our review of the record shows Mr. Lowe testified Mr. Fleet complained to him at least twice that "[Mr. Fleet] didn't like Mr. Gomez" and felt "like [Mr. Gomez] was targeting him" and Mr. Lowe spoke to Mr. Gomez about the complaints. Appx. 155a at p. 45. Mr. Gomez testified he could not recall if Mr. Lowe ever spoke to him about Mr. Fleet's complaints about being targeted. Appx. 112a at pp. 55-56. Mr. Fleet considers this a credibility issue presumably precluding summary judgment. Even if there is a discrepancy in testimony between Mr. Lowe's testimony and Mr. Gomez's testimony (and we are not convinced there is a discrepancy created from Mr. Gomez's inability to recall events), we do not see it as creating a genuine issue of material fact on Mr. Fleet's retaliation claim. It does not create an issue on the question of pretext because the discrepancy, if any, is not sufficient to convince the factfinder both that Terminals' proffered explanation for its termination is a pretext, and retaliation for complaints about race discrimination is the real reason for the termination.

[167] *Dellapenna v. Tredyffrin/Easstown Sch. Dist.*, No. 09-6110, 2011 WL 130156, at * 11 (E.D. Pa. Jan. 13, 2011) (citing *Hare v. Potter*, 220 F.App'x 120, 134 (3d Cir. 2007) and *Finches v. Depository Trust and Clearing Corp.*, 604 F.3d 712, 721 (2nd Cir. 2010)).

[168] ECF Doc. No. 56 at p. 19 (emphasis added).

[169] Appx. 371a-372a.

[170] Appx. 372a.

[171] Appx. 444a.

[172] Appx. 115a at pp. 68-69.

[173] Appx. 116a at pp. 72-73.

[174] *Ke v. Drexel Univ.*, No. 11-6708, 2013 WL 1092661, at *14 (E.D. Pa. Mar. 14, 2013) (quoting *Boykin v. Bloomsburg Univ.*, 893 F.Supp. 400, 405 (M.D. Pa. 1995)). Individual liability under the FMLA, PHRA, and PFPO require personal involvement. *See Edelman v. Source Healthcare Analytics, LLC*, No. 16-6280, 2017 WL 3034329, at *4 (E.D. Pa. Jul. 18, 2017) (supervisor is liable under FMLA when individual is "responsible in whole or in part for the alleged violation"); *Holocheck v. Luzerne County Head Start, Inc.*, 385 F. Supp. 2d 491, 496-97 (M.D. Pa. 2005) (supervisor liable under Section 955(e) for direct acts of discrimination or failure to act to prevent further discrimination); *Clinkscales v. Children's Hosp. of Phila.*, No. 06-3919, 2009 WL 1259104, at *6 (E.D. Pa. May 7, 2009) (boilerplate allegations insufficient to state a claim under Section 955(d)); *Vazquez v. Car & Duff, Inc.*, No. 16-1727, 2017 WL 4310253, at *8 (E.D. Pa. Sept. 28, 2017) (retaliation claim under Fair Practices Ordinance against individual failed where plaintiff failed to allege individual "had a hand" in the alleged retaliatory conduct).

[175] *Staub v. Proctor Hosp.*, 562 U.S. 411, 413 (2011).

[176] *Ramirez v. Palmer Twp.*, 292 F.Supp. 3d 609, 626 (E.D. Pa. 2018) (citing *Burlington v. News Corp.*, 55 F.Supp. 3d 723, 731 (E.D. Pa. 2014)).

[177] *Johnson v. Res. for Human Dev.*, 843 F.Supp. 974, 978 (E.D. Pa. 1994) (citing *Allen v. Denver Pub. Sch. Bd.*, 928 F.2d 978, 983 (10th Cir. 1991)).

[178] Appx. 31a-33a at pp. 96-102.

[179] Appx. 32a at pp. 98-99.

[180] Appx. 32a-33a at pp. 101-102.

[181] SUMF at ¶ 37.

[182] *Id* at ¶¶ 37-38; Appx. 272a-273a.

[183] SUMF at ¶ 37; Appx. 48a at pp. 163-164.

[184] SUMF at ¶¶ 39-41.

[185] Response to SUMF at ¶ 100. Mr. Fleet does not dispute the facts asserted at SUMF ¶ 100; he only denies the conclusion of being insubordinate.

[186] Section 955(e) of the PHRA forbids "any person, employer, employment agency, labor organization or employe, to aid, abet, incite, compel or coerce the doing of any act declared by this section to be an unlawful discriminatory practice, or to obstruct or prevent any person from complying with the provisions or this act or any order issued thereunder, or to attempt, directly or indirectly, to commit any act declared by this section to be an unlawful discriminatory practice."

Section 9-1103(1)(h) forbids "any person to aid, abet, incite, induce, compel or coerce the doing of any unlawful employment practice or to obstruct or prevent any person from complying with the provisions of this Section or any order issued hereunder or to attempt directly or indirectly to commit any act declared by this Section to be an unlawful employment practice."

[187] *Deans v. Kennedy House, Inc.*, 998 F.Supp.2d 393, 414 n.20 (E.D. Pa. 2014) (citing *Scott v. Sunoco Logistics Partners, LP*, 918 F.Supp.2d 344, 357 n.5 (E.D. Pa. 2013)).